

FILED

Mar 11 2015, 10:29 am

CLERK
of the supreme court,
court of appeals and
tax court

ATTORNEY FOR APPELLANT

Deborah Markisohn
Marion County Public Defender
Indianapolis, Indiana

ATTORNEYS FOR APPELLEE

Gregory F. Zoeller
Attorney General of Indiana

Eric P. Babbs
Deputy Attorney General
Indianapolis, Indiana

IN THE

# COURT OF APPEALS OF INDIANA

David Cupello,

*Appellant-Defendant,*

v.

State of Indiana,

*Appellee-Plaintiff*

March 11, 2015

Court of Appeals Case No.
49A02-1406-CR-394

Appeal from the Marion Superior
Court

The Honorable Amy Jones, Judge
The Honorable David M. Hooper,
Master Commissioner

Cause No. 49F08-1401-CM-3589

**Najam, Judge.**

[1] In *Barnes v. State*, 953 N.E.2d 473, 474-75 (Ind. 2011), our supreme court held on rehearing that "the Castle Doctrine is not a defense to the crime of battery or

other violent acts on a police officer."[1] In so holding, the *Barnes* court noted that "[t]he General Assembly can and does create statutory defenses to the offenses it criminalizes, and the crime of battery against a police officer stands on no different ground. What the statutory defenses should be, if any, is in its hands." *Id.* at 475.

[2] In its legislative response to *Barnes*, the General Assembly found and declared that "it is the policy of this state to recognize the unique character of a citizen's home and to ensure that a citizen feels secure in his or her own home against unlawful intrusion by another individual *or a public servant*." Ind. Code § 35-41-3-2(a) (emphasis supplied).[2]

[3] In this case of first impression, David Cupello appeals his conviction, following a bench trial, for battery on a law enforcement officer, as a Class A misdemeanor. We address two issues presented for our review:

> 1. Whether the State presented sufficient evidence that an off-duty constable was engaged in the performance of his official duties to support Cupello's conviction.
>
> 2. Whether the State presented sufficient evidence to overcome

---

[1] The Castle Doctrine arises out of "the common law rule that 'a man's home is his castle,' which gives him the right to reasonably resist unlawful entry." *Barnes*, 953 N.E.2d at 474.

[2] The revisions to Indiana Code Section 35-41-3-2 were drafted by the *Barnes v. State* Subcommittee of the Legislative Council. *See Legislative Council Barnes v. State Subcommittee*, Ind. Gen. Assembly, http://www.in.gov/legislative/interim/committee/lcbs.html (last visited Jan. 28, 2015). The president pro tempore of the Senate, Senator David Long, described the amendment, in part, as "reasserting the 150-year-old law ensuring the right to defend yourself in your home." David C. Long, Editorial, *Legislature Provides Significant Achievements*, Indianapolis Star, Mar. 18, 2012, at B9.

Cupello's affirmative defense, namely, that he had a statutory right to use reasonable force to exclude a law enforcement officer who had unlawfully entered his dwelling.

[4] We first hold that the State presented sufficient evidence that the off-duty constable, Robert Webb, was engaged in the performance of his official duties. However, we also hold that, under the statute enacted by our legislature in response to *Barnes*, the Castle Doctrine is an affirmative defense to the crime of battery on a law enforcement officer when that officer has unlawfully entered the person's dwelling. And we hold that, on the facts of this case, Cupello exercised reasonable force under Indiana Code Section 35-41-3-2(i)(2) to prevent or terminate an unlawful entry by a public servant into his home. Thus, we reverse Cupello's conviction.

## Facts and Procedural History

[5] On January 23, 2014, Cupello had a telephone conversation with a staff member of Emerson Village Apartments ("Emerson Village") in Indianapolis, where he resided, which ended when Cupello hung up on the staff member. In order to "find out what the issue was," Emerson Village dispatched John Lloyd, the office manager, and Christopher Amond, a maintenance technician, to Cupello's apartment. Tr. at 6. But, before they arrived, Lloyd and Amond encountered Cupello in the second-floor hallway that led to his apartment. When Cupello saw Lloyd and Amond, he cursed at them and threatened to call the police. In response, Lloyd and Amond left, and Amond called Constable Webb, an off-duty Pike Township Constable whom Emerson Village employed

part time as a "courtesy officer." *Id.* at 10. As a courtesy officer, Constable Webb took calls on the property, resolved any issues reported by the office, performed random patrols, and locked the laundry room and pool.

[6] Amond reported to Constable Webb that Cupello "had been verbally intimidating," *id.* at 11, and, thus, Constable Webb went to Cupello's apartment to investigate "reports of intimidation," *id.* at 13. Constable Webb knocked and Cupello opened the door. The record does not disclose whether Constable Webb identified himself as a Pike Township Constable or wore his Pike Township uniform, but Constable Webb and Cupello had encountered each other on a prior occasion.

[7] When Cupello opened the door, without Cupello's knowledge or consent, Constable Webb placed his foot just inside the threshold of the door, which opened inwards toward the interior of the apartment. Although Constable Webb did not have a warrant to enter Cupello's apartment, his standard practice is to situate his foot in this way "to make sure [he] can talk to [people] and to keep them from slamming the door in [his] face." *Id.* at 15. While standing at the door, Constable Webb questioned Cupello about the incidents with Emerson Village's staff members, and Cupello complained to Constable Webb that Amond had repeatedly harassed him by revving his vehicle's engine whenever he drove past Cupello's apartment. Cupello stated that he wanted to press charges, but Constable Webb explained that Cupello could not do so "for just revving your motor." *Id.* at 12.

[8]     When Constable Webb told Cupello that he could not press charges against Amond, Cupello became upset, ended the conversation, and, simultaneously, slammed the door to his apartment. Because Constable Webb had placed himself inside the threshold, the door struck Constable Webb in his foot, shoulder, and head.[3] After the first slam of the door, Constable Webb began to push back against the door in an effort to free his foot, which was stuck, and Cupello continued to attempt to shut his door. In doing so, he slammed it two more times in rapid succession and harder than his first effort. The door struck Constable Webb both times, but Cupello managed to close it on the third attempt. After the second contact with the door, Constable Webb told Cupello that he was under arrest for battery on an officer, and, once the door had closed, Constable Webb demanded that Cupello open the door so that Constable Webb could arrest him.

[9]     When Cupello refused to open the door, Constable Webb called for a backup officer and called the Emerson Village office for a key to Cupello's apartment. Then, without a warrant, Constable Webb and the backup officer unlocked Cupello's door with the key, entered his apartment, and arrested him. Constable Webb arrested Cupello solely for hitting him with the door. Constable Webb did not witness the commission of any other alleged crime.

---

[3] On cross-examination, Constable Webb acknowledged that Cupello's door, which opened inwards, would not have struck him had he not crossed the threshold of the apartment.

That same day, the State charged Cupello with battery on a law enforcement officer, as a Class A misdemeanor.

[10] The trial court held Cupello's bench trial on May 12, 2014. At trial, Cupello argued in defense[4] of the charges (1) that Constable Webb was not acting in his capacity as a law enforcement officer but, instead, was "acting in his capacity as an apartment complex employee, as the courtesy officer responding to an apartment issue"; and (2) that the placement of Constable Webb's foot inside the threshold of the door constituted an unlawful entry of his dwelling, and, therefore, Cupello had a statutory right to use reasonable force against Constable Webb to terminate the entry into his home. *Id.* at 19. The trial court disagreed with Cupello and entered findings that (1) "[Constable Webb] was called because of complaints on [Cupello's] behavior," *id.* at 49; and (2) because Cupello and Constable Webb had a "consensual encounter" at the threshold of the apartment, Cupello "acquiesced in [Constable Webb's] presence [in] the door frame." *Id.* at 23, 29, 50. Thus, the court found that Constable Webb had acted in his capacity as a law enforcement officer and that Cupello had consented to Constable Webb's entry, which made the entry lawful. The court, therefore, convicted Cupello as charged and sentenced him to 365 days in Marion County Jail, with 361 days suspended. This appeal ensued.

---

[4] Cupello also moved for a directed verdict, which the trial court denied.

# Discussion and Decision

Cupello alleges two errors. First, he contends that the State presented insufficient evidence to support his conviction because it did not prove that Constable Webb was "engaged in [his] official duty" but, rather, was engaged only in his obligations as a courtesy officer for Emerson Village. I.C. § 35-42-2-1(a)(1)(B). Second, Cupello asserts that, even if Constable Webb was engaged in his official duties as a law enforcement officer, Indiana Code Section 35-41-3-2(i)(2) gave him the right to use reasonable force to prevent or terminate Constable Webb's unlawful entry into his dwelling. We address each argument in turn.

## *Issue One: Official Duties*

Cupello first contends that the State failed to prove that, when he encountered Constable Webb at his door, Constable Webb was engaged in the performance of his official duties, which is a prerequisite to the crime of battery on a law enforcement officer. *See* I.C. § 35-42-2-1(a)(1)(B). Thus, Cupello argues that the State presented insufficient evidence to support his conviction.

Our standard of review for sufficiency of the evidence claims is well-settled. *Tobar v. State*, 740 N.E.2d 109, 111 (Ind. 2000).

> In reviewing the sufficiency of the evidence, we examine only the probative evidence and reasonable inferences that support the verdict. We do not assess witness credibility, nor do we reweigh the evidence to determine if it was sufficient to support a conviction. Under our appellate system, those roles are reserved for the finder of fact. Instead, we consider only the evidence

most favorable to the trial court ruling and affirm the conviction unless no reasonable fact-finder could find the elements of the crime proven beyond a reasonable doubt.

*Pillow v. State*, 986 N.E.2d 343, 344 (Ind. Ct. App. 2013) (citations omitted) (internal quotation marks omitted).

[14]     Further, Indiana Code Section 35-42-2-1 states:

> (a)  A person who knowingly or intentionally touches another person in a rude, insolent, or angry manner commits battery, a Class B misdemeanor.  However, the offense is:
>
> > (1) a Class A misdemeanor if:
> >
> > * * *
> >
> > > (B) it is committed against a law enforcement officer . . . while the officer is engaged in the execution of the officer's official duty[.]

[15]     Although a constable is a law enforcement officer, *see* I.C. § 35-31.5-2-185(a)(1), this case is complicated by the fact that, when the incident with Cupello occurred, Constable Webb was off-duty, was working in his capacity as a courtesy officer for Emerson Village, was responding to a call from Emerson Village's management, and apparently never identified himself, either verbally or by appearance, as a law enforcement officer.

[16]     Nevertheless, an off-duty police officer can perform his official duties, even when responding to a private call.  *See Nieto v. State*, 499 N.E.2d 280, 281-82 (Ind. Ct. App. 1986).  Indeed, in *Tapp v. State*, 406 N.E.2d 296, 302 (Ind. Ct.

App. 1980), we explained that "it is the nature of the acts performed and not whether the officer is on or off duty, in or out of uniform, which determines whether the officer is engaged in the performance of his official duties." Thus, "when a police officer, whether in uniform or not, takes it upon himself to enforce the law in order to maintain peace and order for the benefit of the public, the officer is performing official duties as a police officer." *Neito*, 499 N.E.2d at 282. As such, despite the complications noted above, the State asserts that Constable Webb acted as an officer, not as a private security agent, because he responded to a complaint of intimidation in order "to keep the peace and investigate a possibly criminal incident between Cupello and the apartment staff." Appellee's Br. at 8.

[17] Although the State is correct that Constable Webb's actions evince the execution of the officer's official duties, something more is required: a citizen who encounters an off-duty law enforcement officer must have an objective basis to determine that the officer is acting in his official capacity and not in a private capacity. The holdings in *Tapp* and its progeny demonstrate this principle.

[18] In *Tapp*, for instance, we upheld Tapp's conviction for battery on a law enforcement officer after Tapp had bitten Weisheit, "a plainclothes security guard." 406 N.E.2d at 297. Weisheit had approached Tapp after he had observed her shoplift. In holding that Weisheit was engaged in his official duties, we noted that he had "displayed his police badge and announced his

status to [her[5]] and informed her that she was under arrest pursuant to the laws of this state." *Id.* at 302.

[19] Likewise, in *Nieto* we also upheld a conviction for battery on a law enforcement officer. There, Officer Fourkiller responded to a private phone call to his home from his friend Gomez regarding a domestic dispute between Gomez's mother and Nieto. Fourkiller responded in his personal vehicle and was dressed in plain clothes, and Nieto struck him after Fourkiller "advised Nieto to calm down and not hit the women anymore." 499 N.E.d at 281. Although the facts do not state that Fourkiller identified himself as an officer, Nieto "knew Fourkiller was a police officer" and the reason for the officer's presence. *Id.*

[20] However, in *City of Fort Wayne v. Moore*, 706 N.E.2d 604 (Ind. Ct. App. 1999), a negligent hiring and retention case, we affirmed the trial court's determination that Stanford, an off-duty officer with the City of Fort Wayne, had acted outside the scope of his employment with the City. There, Stanford attacked Moore, and, during the altercation, Stanford "identified himself as 'an officer'" but "never displayed a badge, did not mention the City of Fort Wayne, did not handcuff Moore[,] and never informed Moore that he was under arrest." *Id.* at 605. And Stanford drove "his personal vehicle and was not wearing a police

---

[5] Weisheit stated, "I am a City Police Officer and you're under arrest for shoplifting." *Tapp*, 406 N.E.2d at 297.

uniform or any other apparel that might alert a citizen that Stanford was a police officer." *Id.*

[21] In other words, it is the State's burden to prove by objective evidence that a citizen who has encountered a law enforcement officer either knew or should have known that he was dealing with an officer, a factual predicate that is consistent with our law in other contexts. For example, subsection (a)(3) of our resisting law enforcement statute requires the State to prove that a person fled "after the officer has, by visible or audible means . . . identified himself or herself and ordered the person to stop." I.C. § 35-44.1-3-1(a)(3). And, similarly, Indiana Code Section 9-30-2-2 requires an officer who makes an arrest or issues an information and summons in connection with the operation of a motor vehicle provide indicia to the operator of the vehicle that he is, in fact, a law enforcement officer. That provision provides:

> [a] law enforcement officer may not arrest or issue a traffic information and summons to a person for a violation of an Indiana law regulating the use and operation of a motor vehicle on an Indiana highway or an ordinance of a city or town regulating the use and operation of a motor vehicle on an Indiana highway unless at the time of the arrest the officer is:
>
> > (1) wearing a distinctive uniform and a badge of authority; or
> >
> > (2) operating a motor vehicle that is clearly marked as a police vehicle;

that will clearly show the officer or the officer's vehicle to casual observations to be an officer or a police vehicle.[6]

*Id.*

[22] Thus, where the State seeks to prove that an off-duty law enforcement officer is engaged in the execution of his official duties, it must satisfy a two part test: the State must prove by objective evidence that (1) the nature of the acts performed demonstrate that the officer sought to enforce the law to maintain peace and order for the benefit of the public; and (2) the citizen knew or should have known both that the person was an officer and that the officer was acting in his official, and not his private, capacity. *See, e.g., Tapp* 406 N.E.2d at 297, 302; *Nieto*, 499 N.E.2d at 282.

[23] We now apply this test and hold that, under our highly deferential standard of review, the State met its burden here. The evidence most favorable to the trial court's judgment demonstrates that Constable Webb went to Cupello's apartment to respond to a complaint of intimidation, which may have been a criminal act pursuant to Indiana Code Section 35-45-2-1. Thus, the State proved that Constable Webb took it upon himself to enforce the law in order to maintain peace and order.

[24] Moreover, although the record does not disclose whether Constable Webb wore his uniform or otherwise objectively identified himself as a law enforcement

---

[6] We also note that Indiana has criminalized false assertions of public authority. *See* I.C. § 35-44.1-2-6.

officer, the evidence establishes that Cupello and Webb had dealt with one another on a prior occasion. And, when Constable Webb confronted Cupello on this occasion, Cupello told Constable Webb that he wished to press charges against Amond for harassment. A reasonable inference from this evidence is that Cupello knew that Constable Webb was both a law enforcement officer and acting in his official capacity. The State, therefore, met its burden on the second prong as well.

[25] Thus, we hold that the State presented sufficient evidence to prove that Constable Webb was performing his official duties when he confronted Cupello. We turn now to the questions of whether Cupello had a statutory right to exclude Constable Webb from his home and whether Cupello used reasonable force to do so.

## Issue Two: The Castle Doctrine

[26] Cupello contends that, even if Constable Webb was engaged in his official duties as a law enforcement officer, Indiana Code Section 35-41-3-2(i)(2) gave him the right to use reasonable force to prevent or terminate Constable Webb's unlawful entry into his dwelling. Specifically, Cupello's claim is that the State presented insufficient evidence to rebut his affirmative defense to the State's allegation that he battered a law enforcement officer. We apply the same standard of review to such challenges as we do to other challenges to the sufficiency of the evidence. *Murrell v. State*, 960 N.E.2d 854, 857 (Ind. Ct. App. 2012). "A conviction must be affirmed if the probative evidence and reasonable inferences drawn from the evidence could have allowed a reasonable trier of

fact to find the defendant guilty beyond a reasonable doubt. We consider only the probative evidence and reasonable inferences supporting the judgment." *Id.*

[27] Indiana Code Section 35-41-3-2 provides:

> (a) In enacting this section, the general assembly finds and declares that it is the policy of this state to recognize the unique character of a citizen's home and to ensure that a citizen feels secure in his or her own home against unlawful intrusion by another individual or a public servant.[7] By reaffirming the long standing right of a citizen to protect his or her home against unlawful intrusion, however, the general assembly does not intend to diminish in any way the other robust self[-]defense rights that citizens of this state have always enjoyed. . . . The purpose of this section is to provide the citizens of this state with a lawful means of carrying out this policy.

> * * *

> (i) A person is justified in using reasonable force against a public servant if the person reasonably believes the force is necessary to:

> * * *

>> (2) prevent or terminate the public servant's unlawful entry of or attack on the person's dwelling, curtilage, or occupied motor vehicle[.]

> * * *

> (j) Notwithstanding subsection (i), a person is not justified in using force against a public servant if:

---

[7] A constable is a public servant. I.C. § 35-31.5-2-195(a)(1).

* * *

(4) the person reasonably believes the public servant is:

(A) acting lawfully; or

(B) engaged in the lawful execution of the public servant's official duties.

As stated above, our legislature enacted the relevant provisions of Indiana Code Section 35-41-3-2 in response to our supreme court's opinion on rehearing in *Barnes*. We now apply that statute here.[8]

[28] The probative evidence and reasonable inferences supporting the judgment are undisputed and lead unerringly to the conclusion that Constable Webb unlawfully entered Cupello's dwelling by placing his foot within the threshold of the apartment door without lawful justification. As our supreme court explained in *Middleton v. State*, 714 N.E.2d 1099, 1101 (Ind. 1999):

> For purposes of the Fourth Amendment, . . . the threshold of a home is the line that law enforcement officers cannot transgress without judicial authorization. . . . [T]he Fourth Amendment has drawn a firm line at the entrance to the house. Absent exigent circumstances, that threshold may not be reasonably crossed without a warrant.

---

[8] Both Cupello and the State rely on self-defense cases that predate the amendments to Indiana Code Section 35-41-3-2. Thus, they dispute whether Cupello "1) acted without fault, 2) . . . was in a place where he had a right to be, and 3) . . . was in reasonable fear of death or great bodily harm." Appellant's Br. at 14. However, the statute itself provides a framework to analyze this case, independent from the elements of the case law, which are not enumerated in the statute. Thus, we consider the statute's requirements alone.

And, in Indiana, "any breach of the threshold, however slight, by any part of the body" constitutes criminal residential entry. *Williams v. State*, 873 N.E.2d 144, 148 (Ind. Ct. App. 2007); *see* I.C. § 35-43-2-1.5.

[29]  Our jurisprudence regarding resisting law enforcement during an arrest performed within the arrestee's home also sheds light on what it means for an officer to unlawfully enter another's dwelling. *See Harper v. State*, 3 N.E.3d 1080, 1085 (Ind. Ct. App. 2014); *Adkisson v. State*, 728 N.E.2d 175, 178 (Ind. Ct. App. 2000).[9]  In *Adkisson*, a police officer questioned the defendant about an alleged battery.  The officer approached her closed door, and, when she answered, he

> stood just outside Adkisson's open doorway while he questioned her, and Adkisson remained inside her apartment. . . .  At some point, Adkisson attempted to shut the door on [the officer], but he prevented her from doing so by placing his foot in the doorway.  [The officer] then informed Adkisson that she was being arrested for battery[10] and followed her into the residence. As [the officer] entered her apartment, Adkisson pushed him and began to run down the hallway.  [The officer] followed Adkisson

---

[9]  The State contends that *Harper* and *Adkisson*, both of which deal with resisting law enforcement, should not apply here because the resisting law enforcement statute requires that "the officer is *lawfully* engaged in the execution of the officer's duties," I.C. § 35-44.1-3-1(a)(1) (emphasis added), while battery on a law enforcement officer does not require the "lawful" execution of the officer's duties, *see* I.C. § 35-42-2-1(a)(1)(B).  But, as the State acknowledges, Indiana Code Section 35-41-3-2(i)(2) allows the use of force to prevent or terminate an *unlawful* entry by a public servant into one's home.  One is precluded from the use of force if he believes that the officer is lawfully engaged in the execution of his official duty.  *See* I.C. § 35-41-3-2(j)(4).  We, therefore, find *Harper* and *Adkisson* instructive.

[10]  The battery for which the officer arrested Adkisson was reported by her neighbors before the officer went to her door and was independent from the closing of her door.  *See* 728 N.E.2d at 176.

and sprayed her with mace. Adkisson continued to struggle and run from [the officer] until he had maced her three times. Being helplessly subdued, [two officers] were able to handcuff her.

728 N.E.2d at 176-77.

[30] We reversed Adkisson's conviction for resisting law enforcement and stated that, although the officer "arguably had probable cause to believe that Adkisson had committed battery" and, therefore, "the right to arrest her without a warrant, . . . absent consent, the Fourth Amendment [nevertheless] requires that . . . an officer may only enter a defendant's home to make the arrest when exigent circumstances exist that make it impracticable to obtain a warrant first." *Id.* at 177. Thus, we held that the officer had acted unlawfully when he entered Adkisson's home, *see id.* at 178, which meant that the State could not prove an essential element of the crime, namely, that "the officer was lawfully engaged in the execution of his duties as an officer," *id.* at 177.[11]

[31] In this court's recent opinion in *Harper*, we reached the same conclusion as in *Adkisson* where officers had lied to obtain consent to enter the defendant's home in order to conduct a warrantless arrest. *Harper*, 3 N.E.3d at 1081. We equated the officer's "use of a 'ruse' to enter Harper's home" with the "*Adkisson*'s

---

[11] The court in *Adkisson* distinguished its holding from *United States v. Santana*, 427 U.S. 38, 40 (1976), which upheld a warrantless arrest that began in a public space when the police shouted "police" but was completed within the defendant's home after he retreated indoors. 728 N.E.2d at 177-78. The situation here is also unlike *Santana*. Constable Webb testified that he had arrested Cupello solely for battering him and that he had not observed Cupello commit any other alleged crime.

deputy's decision to place his foot in Adkisson's doorway to prevent her from closing her door." *Id.* at 1085.

[32] Here, as in *Adkisson* and *Harper*, Constable Webb did not have a warrant to enter Cupello's apartment, nor does any exception to the warrant requirement apply. And while the officers in *Adkisson* and *Harper* had probable cause to conduct a warrantless arrest, here, Constable Webb lacked probable cause to invade Cupello's residence in the first instance.[12] Constable Webb had no lawful justification for breaching the threshold of Cupello's apartment, and, in so doing, he was not lawfully engaged in the execution of his duties as an officer. *See Adkisson*, 728 N.E.2d at 177.

[33] Thus, as a matter of law, Cupello was entitled to use reasonable force to terminate Constable Webb's unlawful entry and to prevent further entry by Constable Webb into his home. *See* I.C. § 35-41-3-2(i)(2) To prevent entry into his home, Cupello used reasonable force when he closed the door. Given that Constable Webb had inserted his foot to prevent the door from closing, Cupello's natural response was to persist in attempting to close the door, and, while several tries were required, his conduct to thwart the unlawful entry was not disproportionate to the entry itself.

---

[12] But even if Constable Webb had probable cause to arrest Cupello, which he clearly did not, the State has not shown exigent circumstances that would have made it impracticable for Constable Webb to first obtain an arrest warrant. Indeed, Constable Webb had time both to call for backup and to obtain a key to Cupello's apartment.

[34] Given the undisputed evidence, the State attempts, as it did at trial, to negate Cupello's affirmative defense by arguing that the evidence supports an inference that Cupello consented to Constable Webb's entry into his home. Despite the fact that Cupello testified that he did not give Constable Webb permission to enter his home, the trial court accepted the State's argument, finding that Cupello acquiesced in Constable Webb's entry by having a conversation with Constable Webb at the threshold of his apartment. But we reject the notion that a conversation held at the threshold of one's home is, in itself, an invitation for a law enforcement officer to enter the home. To the contrary, as our supreme court has succinctly stated:

> Opening the door to ascertain the purpose of an interruption to the private enjoyment of the home is not an invitation to enter, but rather is a common courtesy of civilized society. Attendant to this courtesy is the ability to exclude those who are knocking and preserve the integrity of the physical boundaries of the home.

*Cox v. State*, 696 N.E.2d 853, 858 (Ind. 1998). Had Cupello wished to invite Constable Webb into his home, he would have made that invitation explicit, and Constable Webb would not have needed to place his foot in the threshold surreptitiously. The conversation at the door provided neither consent nor acquiescence to Constable Webb's entry.

[35] Nevertheless, the State argues that, under Indiana Code Section 35-41-3-2(j)(4), Cupello lacked justification to use force because he had a reasonable belief that Constable Webb was acting lawfully or engaged in the lawful execution of his duties. But we have already established that Constable Webb acted unlawfully

when he breached the threshold of Cupello's dwelling. *See, e.g.*, *Adkisson*, 728 N.E.2d at 177 (holding that the unlawful entry into a private dwelling is not a lawful execution of an officer's duties). Therefore, we reject the State's argument.

[36] Finally, the State argues that, because Cupello did not know Constable Webb had placed his foot inside Cupello's apartment, Cupello could not have had a reasonable belief that force was necessary to prevent or terminate Constable Webb's entry. We cannot agree. Cupello merely attempted to end the conversation with Constable Webb by closing the door. However, when he tried to close the door, he discovered that Constable Webb had obstructed the path of the door with his foot and that the door would not close. At this point, Constable Webb's foot became stuck, and he began to resist the door. Thus, Cupello began to struggle against Constable Webb, and Cupello slammed the door two more times, harder than in his first attempt. In other words, Cupello discovered Constable Webb's unlawful entry when he first attempted to close the door and, after two more attempts, was able to terminate the unlawful entry into his dwelling. Constable Webb had entered Cupello's apartment without consent, probable cause, reasonable suspicion, or exigent circumstances. Because Constable Webb resisted Cupello's subsequent attempts to close the door, Cupello had a reasonable belief that force was necessary to terminate Constable Webb's unlawful entry into his apartment.

[37] We hold, therefore, that the State presented insufficient evidence to rebut Cupello's affirmative defense. Again, the probative evidence is undisputed.

The placement of Constable Webb's foot inside the threshold of the apartment door was an unlawful entry by a public servant into Cupello's dwelling, and Cupello exercised his statutory right under Indiana Code Section 35-41-3-2(i)(2)—which reaffirmed that the Castle Doctrine is an affirmative defense to the crime of battery on a law enforcement officer—to use reasonable force both to terminate that entry and to prevent further access to his home. Cupello used reasonable force by closing his door. Thus, as a matter of law, the facts do not support a conviction for battery on a law enforcement officer.

[38]   Reversed.

Bradford, J., concurs.

Mathias, J., concurs with separate opinion.

David Cupello,

*Appellant-Defendant,*

v.

State of Indiana,

*Appellee-Plaintiff*

Court of Appeals Case No.
49A02-1406-CR-394

**Mathias, Judge, concurring**

[39] I fully concur in the majority's holding that Cupello exercised reasonable force under Indiana Code section 35-41-3-2(i)(2) to prevent or terminate Constable Webb's unlawful entry into Cupello's home.

[40] I find it especially disturbing that Constable Webb freely admitted that it was his "standard practice" to place his foot just inside the threshold of the door when talking to someone, to "to keep them from slamming the door in [his] face." Tr. p. 15.  As the majority notes, without a warrant, this is an unconstitutional entry into the home, *see Middleton*, 714 N.E.2d at 1101, and arguably criminal residential entry, *see Williams*, 873 N.E.2d at 148, I.C. § 35-43-2-1.5.  However rude it might be to do so, a private citizen has a right to

close his or her door on any unwelcome visitor, including a police officer, unless the officer has a warrant.

[41] I also concur with the majority's conclusion that, under the particular facts and circumstances of this case, the trial court, as the trier of fact, could reasonably conclude that Constable Webb was engaged in the execution of his official duties.

[42] However, despite my concurrence with this conclusion, I would note that confrontations such as the one that occurred in this case—where a citizen encounters an off-duty law enforcement officer working in the private sector but acting in his official capacity—are fraught with ambiguity and room for misunderstanding. *See generally* Patricia Kubovsak Golla, Annotation, *Performance of Public Duty by Off–Duty Police Officer Acting as Private Security Guard,* 65 A.L.R.5th 623 (1999).

[43] For the benefit of both law enforcement officers and citizens, the General Assembly should consider clarifying what easily visible and audible indicia are required to place a citizen on notice that he is dealing with an off-duty law enforcement officer who is, nevertheless, acting in his official, and not his private, capacity, as the legislature has already done in Indiana Code section 35-44.1-3-1(a)(3) (resisting law enforcement officers) and section 9-30-2-2 (when a law enforcement officer may make a traffic stop and issue citations). Such indicia might include wearing a standardized vest or uniform and/or displaying a badge and audibly notifying the citizen of his public authority.

[44] Likewise, the General Assembly should consider the clearly intended and confusing appearance of private security personnel dressed in uniforms of the same color, and with identification patches that are the nearly the same, as those worn by sworn officers, as it has done with its strict limitation of blue and red emergency lighting on private vehicles. *See* Ind. Code § 9-21-7-10 (providing that a person in a non-emergency vehicle may not operate a vehicle with a lamp that displays a red, red and white, or red and blue signal). One need only drive in downtown Indianapolis during the afternoon rush hour to witness such private security personnel routinely stopping traffic with the legal right of way on busy public streets and highways for the benefit of private parking facility owners. These persons do this without any apparent statutory authority,[13] and perhaps even commit an infraction when they do so.[14]

[45] Without such careful consideration and differentiation by the General Assembly, Hoosiers have a right to wonder precisely who has been invested with the public authority to regulate civil society, and to resent the instances

---

[13] As I noted in *Key v. Hamilton*, 963 N.E.2d 573, 588 (Ind. Ct. App. 2012), *trans. denied*, drivers are required to obey only the signals of certain, authorized persons, i.e., a police officer directing traffic and a flagman in a construction zone. *See* Ind. Code § 9-21-8-56 ("It is unlawful for a person to knowingly fail to comply with a lawful order or direction of a law enforcement officer invested by law with authority to direct, control, or regulate traffic"); Ind. Code § 9-21-8-56 (making it a criminal offense to "recklessly fail[ ] to obey a traffic control device or flagman ... in the immediate vicinity of a highway work zone when workers are present[.]"). I am unaware of any similar statutory authority concerning private security guards.

[14] *See* Ind. Code § 9-21-17-5 ("A pedestrian may not suddenly leave a curb or other place of safety and walk or run into the path of a vehicle that is so close as to constitute an immediate hazard."); Ind. Code § 9-21-17-24 ("A person who violates this chapter commits a Class C infraction.").

where government has apparently delegated public authority to private security for purely private purposes and gains.

[46] Subject to these additional public policy concerns, I fully concur in the majority's decision.